Case number 23-3177, United States of America v. Frederick Gooding, at balance. Mr. Flannery, for the at balance. Mr. Lieberman, for the appellate. Good morning, counsel. Good morning, your honor. It's my honor and privilege to represent Dr. Gooding, a man whose only offense was to try to treat his patients, seniors who, like many patients across America, are the collateral damage of a DEA policy to shut down all doctors who give pain medications more than a Tylenol. The first proposition that we raised in our brief on appeal was judicial bias, that we are entitled to an impartial tribunal, and in this case, we did not have one. We did not have one for the end of the first case that resulted in a mistrial, and we certainly did not have one on the second trial. I do not say that this was done with any forethought. We found out about it only because of the admission by the judge, judge who is well regarded and well respected, who honestly expressed her opinions. Now in 28 U.S.C. 455A, it provides that we can challenge and look for the impartiality that might reasonably be questioned. We have that here. There is a second provision in the code, 455B, which talks about personal bias or prejudice. The government, in its brief, my colleague, cites an affidavit that is connected to that second prong, personal bias or prejudice, rather than her impartiality might reasonably be questioned. 28 U.S. Code section 144. Did you raise this issue below? Yes. You raised it before the judgment? No, no, no, we did not raise it below, Your Honor, because we found out about it after a year of this bias being concealed from the government. Did you find out about it while you were still in district court? I'm sorry, I didn't hear you. Were you still in the district court when you found out about it? After sentencing, yes. Okay. Why didn't you raise it in the district court? Because it would have been futile. Why? Because all the damage had already been done. Her removal from the case at that point would not have solved any of the So her removal will not resolve your bias claim? You just said that her removal would not solve your bias claim? No, because the bias had already done its damage. Well, normally what happens if you actually have a bias claim is that there'd have to be a new trial. Well, I think when a court says that it doesn't trust the word that you say, you are not entirely candidate. I do not believe you told the truth on the stand. And when you say just before a mistrial in the first trial, and you go through a whole second trial. And that's not the question I asked you. I'm asking you, you're supposed to raise these issues. You're not supposed to save them for appeal. Well, there is no requirement for a waiver as the first prong of 455A. Our precedent says if you don't raise it in a timely manner before the district court, even though you knew about it, you have waived the argument. Well, first of all, it couldn't be a year since September of 2000. It's timely if you become aware of it while you're in the district court. You become aware of it and the case is over. The case has ended. There is nothing for the judge to do. You can ask for reconsideration. But there is no debate about the words. And 28 USC 144 speaks of raising precedent on this issue. I think the statute is sufficient. And yes, is our precedent not relevant to this issue? Is that your position? My position is that the cases that cite 28 U.S. section 144 are limited to the question of personal bias or prejudice, which is 28 USC 455B. Your position is you just can raise this for the first time on appeal. I just want to understand your position. My position is we first knew about it at the end of the case in the district court. That's a factual answer. I'm asking you what your legal position is. My legal position is we we raised it on appeal. Don't interrupt. So please explain to me what your legal position is on when these can first be raised. We raised it on appeal. And you don't have any obligation. Would you have any obligation to raise it in district court if you learned about it? Not on the circumstances of this case. Now, it's not what I'm asking for a legal position. You want us to write an opinion? Well, you just asked me a question. Is your position that had you learned about this mid-trial, on the second trial, that you still, given the statute's words, would not have to raise it on appeal, until appeal? I would have raised it during the trial if I knew about it. You just said the statute doesn't seem to require you to raise it in the district court. No, what I said was the statute does not require an affidavit except if you're invoking 28 U.S.C. 455B, which involves personal bias or prejudice. And the affidavit mentioned in 28 U.S.C. 144 is an affidavit limited to that question, personal bias or prejudice. And in that circumstances, and only in that circumstance, in any authority I can find, is the only case in which an affidavit is considered. And an affidavit does not have to be it can be ignored. It can be overlooked. You don't have to file an affidavit even as to the prong B, personal bias or prejudice. And as an example of what went wrong here, is we have the court, on the one hand, saying that the similar act out of a Delaware administrative proceeding doesn't apply. That is her statement, the court's statement, on August the 8th, 2022. And then my client's testimony is on September 12th, 2022. And after that date, then we see these rulings that are consistent with this bias that she expressed only a year later, toward the end of the second case, after the sentencing. So what our precedent says is to raise this exact type of claim. You have to raise it, quote, within a reasonable time after the straightforward question is, why couldn't you have raised this during the sentencing hearing, or at a reasonable time after the sentencing hearing? That would allow the district court to respond, to build a record, and then it goes up on appeal. And that's what our cases say is required. Well, but we raised it, we raised it within literally days after we knew about it in the appeal. Right. And, and, and the argument that you're making to me is that we can have a bias tribunal, but procedurally, we can protect that bias, should it not be raised then, when it would be a futile exercise, given the fact that the prejudice that exists for more than a year in the trial court, to the disadvantage of my client, who's entitled to an impartial tribunal, which he did not have. So it's not an argument. It's just, we as a panel are bound by our precedent. So it seems to me, it's very straightforward that a motion could have been filed after the impossible, for example, for you to do that. Impossible. You think it would have been futile. I mean, I think anyone who thinks the judge is biased against them probably thinks that the recusal motion is biased. I think this is futile. Sorry, sir. Yeah, go ahead. I think this circuit, forgive me too much, New York. I think this circuit has only expressed this view about an affidavit. And when it's raised in the question of personal bias or prejudice, which is pronged 455B. That's my position. And I understand what you're saying, that you have said, if you don't raise a question and don't object and so forth. Okay. But I found no cases in which a judge had admitted to a bias more than a year after two cases had concluded and admitted that she believed that my client was not entirely candid and so forth. And that her opinions in the changed after that. Rarely do we see an expression of bias so clear and so evident by a jurist. And I'm talking about a lifetime of seeing judges say, oh, I said that I shouldn't have said that and reacting to it. Can you explain why this was so out of bounds? It seems to me that at sentencing, it is fairly commonplace for judges to comment on how forthcoming they think the defendant was and how candid they were during the trial. Well, I'll give you an example. In August 8th, 2022, the court said that it thought that the similar act so alleged out of Delaware was an act that could be considered too prejudicial, involved malpractice, negligence, that it had no bearing on this case unless at any time it could be presented that the implication of knowledge was necessary as a result of that earlier proceeding. After that, the judge heard my client's testimony at the first trial and her judgment changed. Now, people can have biases. The court had a bias. The court made reference to the family's experience in the medical profession and suggested that that was a reason. The judge said we would not consider, if you will, malpractice elements in the case. Well, and the malpractice elements in the case were raised as a result of this earlier proceeding, never permitted to be considered by the court. So the court said, but then they were. There were no instructions to the jury as to how to handle them. And in the case, we had two barrels of information. One barrel was excluded from anything having to do with ultrasound. The other barrel only mentioned the questions of fluoroscopy and CT as imaging devices. What the government did was they only looked at those codes that involved fluoroscopy and claimed, see, see all of this. Ignoring the fact that was disclosed and not deceived was in every instance we can find, and it's spelled out in our brief, in every instance we can find, the government was informed, that is, Medicare was informed of my client's use of ultrasound codes that were recognized. Thank you very much, counsel. Your time is up. Thank you, your honor. My understanding is you do not, did not wish to have any time for rebuttal. Is that correct? If I could have two minutes, I would appreciate it. Okay, because you told the clerk you didn't want any time for rebuttal? No, I didn't expect to spend so much time enjoying our discussion about the first issue. Okay. We have the United States now. Good morning, your honors. May it please the court, Dave Lieberman for the United States. Turning to the judicial bias argument, I think from the court's questions, the court understands the government's position. We read this court's precedents to say that a that's the Bryce case that we cited. Bryce cites a previous case, Barrett, that I think has the exact factual circumstance at issue here, raised for the first time on appeal. Alternatively, we think that the district court here, Judge Tuchkin, for the reasons expressed by Judge Garcia, it was permissible for the judge to consider a defendant's obstructive conduct during the course of the proceeding. We've cited a number of circuit cases, including this court's decision in the Ransom case, and we've also cited the Supreme Court's decision in Liteki, which makes clear, in our view, that events that happen inside the courtroom, inside the proceeding that a judge observes and rules on is not ordinarily grounds for judicial bias, absent a showing of deep-seated antagonism, and the record does not show that here. I just wanted to flag at least a different recollection of the timeline and my opposing counsel as to the first trial, as to when the judge made certain rulings, as I understand the record on day four, Government Supplemental Appendix 40 and 41. This is where Judge Tuchkin concluded that issues of Dr. Gooding's knowledge were in play and therefore authorized the admission of the redacted Delaware Medical Board order, and then by my recollection at the first trial, Dr. Gooding testified subsequent to that, so I think she issued her ruling before the defendant testified, so I don't see how that possibly evidences her bias. Mr. Flannery referenced some comments by the District Court regarding the prejudicial nature of the redacted Delaware Medical Board order as evidencing her initial position. If I could provide some context, these were in the reply brief at pages 16 and 17. The court made those comments at the pre-trial conference before the first trial, and the court was looking at the unredacted version of the Delaware Medical Board order, which provided extensive detail on Dr. Gooding's actions with respect to the patient in that case and made a number of findings unrelated to the fluoroscopy requirement. I think everybody in the courtroom agreed could not come in in this case. These were the findings of negligence and certain things that Dr. Gooding failed to do after the patient deteriorated in his office, lack of training, lack of records. We can provide the court with a copy of the unredacted order if you would like to see what Judge Chutkan was looking at when she made those comments. It is later at the pre-trial, on day four, Judge Chutkan supervises the extensive redaction of the medical board order, which you have in the government supplemental appendix, to remove all of these collateral matters. And she finds that these redactions are sufficient to remove her concerns, her initial concerns about prejudice. I have no further comments unless the court has any questions about the judicial bias issue. I would ask you about the 404 issue about the omission of this medical board. Yes, your honor. The redacted version of the medical board order. That involved different procedures. The conduct at issue was eight years before the conduct at issue in this case. And it had nothing to do with how things were billed to Medicare or knowledge of what Medicare required or standards that it required. It dealt only with Delaware standards of care. So how under McGill and other precedents was that report not too stale in time and its conduct, the conduct that it addressed, too far afield to outweigh the prejudice and the prejudice balance? So let me take the staleness issue first, and then I'll go to the second part of your question. As to the staleness of the 2009 medical board order, but the restrictions in Delaware continued on for multiple years afterwards. It was also, that order was... You're admitting it for the conduct, and you're trying to show knowledge about conduct. The fact that he had a suspension in Delaware isn't the conduct that you're trying to admit. You wanted to admit, and you admitted into evidence was that he had performed these procedures without fluoroscopy or CT. They were different procedures, but he had performed them without those technological supports. That time gap between when he performed those without technological support and when he performed the procedures at issue here without the procedures that Medicare requires was at least eight years. So I think the time... Yes? Yes. Okay. And that's way too long under McGill. So I would ask the court to take a look at both the results of the Delaware Medical Board order. I have looked at it. Yes. And the instructions about the standard of care and the probationary period continue for multiple years beyond 2009. And the same restrictions were adopted by the DC Medical Board and went up to 2014, which is a year before this scheme started. Were you admitting the report to show the length of the sanctions or to show that he had engaged in similar conduct? To show his knowledge of the fluoroscopy requirement. Okay. Well, his failure to comply with the requirements, his knowledge of it. But that was... So you're saying that would have been at least when the board issued its decision in 2010. So you're still dealing with a five-year period. I think that's right. But the fact that the board had sort of put on probationary periods and it was going to continue to monitor him for compliance with the instructions regarding the standard of care, specifically the fluoroscopy requirement, the fact that the DC Medical Board incorporates the same up through 2014 gets us right to the doorstep of the conduct at issue here. So we think it... Delaware's medical standards. But that's not... This case is about filings, fraudulent filings with Medicare, which seems to me... I mean, I don't know how, even if I give you the time gap, his knowledge of what Delaware required as a standard of care informs what Medicare is going to require for billing. So two responses to that, Your Honor. First, the scheme that we charged, this is paragraph 17 of the indictment, we alleged he submitted false and fraudulent claims for services that he knew were not medically necessary. That's the Medicare standard. And so evidence that he had been informed of the standard of care in Delaware, and that the DC Medical Board subsequently adopted... So that might be... Sorry, just to interrupt. Yes. This might be the gap in my understanding. When the DC Board opposed reciprocal discipline, which we do all the time as to attorneys, does that mean that DC has this... Does that show that DC just does reciprocal discipline, or does it have the exact same standard of care on this very issue? I honestly don't know the details of the DC... If it doesn't show that, then I'm not sure how it helps. I mean, if it means that they have the same standard of care, so that he would know he wasn't doing the standard of care in DC when he was doing these procedures, and yet was filing with Medicare, that would be... So if I'm recalling the record correctly, the DC Medical Proceedings, I think they were started by this reciprocity that Your Honor is talking about. But Dr. Gooding did not contest the decision of the DC Board to basically adopt the same probationary terms as... That's different than saying adopting the same standard of medical care in DC. I mean, maybe this is a universal standard of care. I don't have any idea, but there's... At least I haven't seen record evidence about that. So we also had a medical expert essentially testify that this is the standard of care everywhere. And the other point that I want... That's the theory. That's the kind of theory that it wasn't just that it was a reciprocal probation, but he knew when he set foot in DC and did procedures here, that at least for some forms of spinal injections, he had to do a FOSC or CT to comply with the standard of care. That's the connection, Your Honor. And a second basis is the defendant, Dr. Gooding, offered a good faith defense at trial. And if you look at... This is in his closing argument where counsel talked about Dr. Gooding was doing what is best for his patient population. He's treating them how he knows best. And he argues that all of this defeats the government's claim of intent, intent to deceive, intent to defraud. Part of his argument is that I filled out forms where I told Medicare exactly what I was doing. There was some special billing form that indicated he was doing it with ultrasound. Why does Medicare allow billing codes that it doesn't compensate for? So the testimony at trial was that the billing codes are medical codes not created by Medicare, but by the American Medical Association. And that the codes that the defense was referencing, the T-codes, are for experimental, unapproved procedures. But they still get codes because it's a record-keeping point. There was unchallenged testimony that Medicare does not provide reimbursement for T-codes. Your Honor also asked... Your first question asked about that these were different procedures. I just want to respond to that. So the Delaware procedure was a cervical spinal injection, so at the top of the spine. The procedures discussed at trial were in the lower portions of the spine. And Dr. Gooding in his reply brief to this court has argued that these were different procedures, couldn't possibly show knowledge. That argument has been raised for the first time in the reply brief. It's not in the opening brief where the 404B claim is at pages 48 through 53. So in our view, this claim has been abandoned or forfeited. Did he raise that point in district court in opposing the admission of the records? No, Your Honor. So district court docket number 42, his motion in limine, that was before the first trial. His district court docket number 100, that's in advance of the second trial. There's no message of this distinction claiming a difference between injections at the top of the spine versus injections at a lower portion of the spine.  He admitted knowledge of what was required, did he not? Absolutely. And in the defense motion in limine before the first trial, district court docket number 42, page four, the only mention of this actually goes in the opposite direction. The motion, defense motion, talks about the Delaware procedures and then makes reference to, quote, the similar medical procedures in this case. That happened again at, this is separate and apart from admissibility, but this happened again with Dr. Gooding's own trial testimony in the first trial. He talks on direct about the dangers of cervical spinal injections. On cross-examination, my colleague asked him about the medical board. He acknowledged standard of care, the fluoroscopy requirement with respect to cervical injections. The trial transcript, district court document number 90, transcript pages 976, 977. My trial colleague then asks about the facet joint injections in this case. This is a direct question to Dr. Gooding. Is it fair to say that the procedure is virtually the same procedure, just in different parts of the spine, the cervical spine, the thoracic spine, the lumbar spine? You agree with that? Answer from Dr. Gooding, yes. And so just compiling all of the information before the district court in terms of what was raised, what was not raised in the motions in limine and our responses, the district court had no notice that there was any dispute that these were different spinal procedures such that evidence of knowledge with respect to the fluoroscopy requirement as to the procedures at the top of the spine did not extend to Dr. Gooding's knowledge of the requirement and into lower portions of the spine. Unless the court has any other questions about this or any additional claims, the government asks that the court affirm. Thank you. All right, Mr. Flannery, we'll give you the two minutes you requested. Thank you, Your Honor. The Delaware proceeding referred to any performance of cervical and paracervical injections. It's in our brief at page 12, our opening brief, and cites the indictment at page 3, paragraph 11, and it's in the appendix at page 3. The government, however, talks about spinal injections instead of paracervical. The significance is the difference in the bone structure and how much more care must be administered when dealing with the upper region of the spine as opposed to the lumbar and sacral sections of the spine. They just explained that this distinction was not raised before the district court when the issue of omitting the Delaware report came up in either case. It was argued. It was argued because of the distinction and the argument was frequently made. Do you have a record citation? As I stand, no, but I can supply it, Your Honor. The argument in the trial was very much about two things, I would say. One is that the codes that my client used were disclosed to Medicare. So it wasn't a question of deception. It was a question of disclosure. They had the disclosure. But in the arguments made in the case, we only talked about those codes that the government chose to focus on that they said were violative and that could not be said because he should know that it can only be done with fluoroscopy or CT. The AMA codes, which provided for ultrasound, not only were in the code book for all the years that are relevant to the charged indictment, but also they were charged and the government says we presume the honesty of our providers. Now, while that may be what they say, the evidence is that for everybody, both my client and the peers that they used, that they were permitted to both submit requests and those requests by my client and others, and my client included the ultrasound codes, the AMA codes, that they granted money for it. And first they said it could be. I think we have that argument. You have that in my brief, yes. All right. Thank you. The case is submitted. Thank you, Your Honor. Thank you, panel.
judges: Henderson, Millett, Garcia